TALBOT & HIGGINS LUMBER CO. *v.* MCLEOD LUMBER CO.*

(In Banc.    June 13, 1927.)

[113 So. 433.    No. 26127.]

1. APPEAL AND ERROR. *Supreme court itself will raise question of limitation on its powers to reverse or annul judgment for want of jurisdiction (Const. section 147).*

   In case neither party to appeal raises question as to limitation on power of supreme court, under Const., section 147, to effect that judgment or decree shall not be reversed or annulled for want of jurisdiction, supreme court will raise question itself.

2. JURY. *Right of jury trial in civil causes remains inviolate, except in cases of exclusively law cognizance, where chancery courts erroneously assume jurisdiction (Const., sections 31, 147).*

   Under Const., sections 31, 147, construed together, right of trial by jury of issues of fact in civil causes in circuit courts remains inviolate, except in cases of exclusively law cognizance, where chancery courts erroneously assume jurisdiction.

3. APPEAL AND ERROR. *Supreme court may not correct error, if any, in chancery court's assuming jurisdiction of suit to enjoin law action (Const., section 147).*

   Under Const., section 147, supreme court is without power to correct error, if any, in chancery court's assuming jurisdiction of

suit to enjoin prosecution of an action at law pending in cir-
cuit court.

ETHRIDGE, J., dissenting.

---

*Reporter's note:* Several briefs in this cause were missing from the
record. Since authorities cited in remaining briefs are referred to in
the opinions, further citation seems unnecessary.

---

*Corpus Juris-Cyc References:* Appeal and Error, 3CJ, p. 371, n. 50;
p. 372, n. 51, 53; 4CJ, p. 1163, n. 16 New; Courts, 15CJ, p. 1077, n. 13;
Juries, 35CJ, p. 148, n. 6; p. 149, n. 15'; p. 159, n. 33; p. 161, n. 50;
p. 162, n. 68; p. 170, n. 61.

APPEAL from chancery court of Forrest county.

HON. T. P. DALE, Chancellor.

Suit by the McLeod Lumber Company against the Tal-
bot & Higgins Lumber Company. Decree for complain-
ant, and defendant appeals. Affirmed and remanded.

*R. L. Bullard,* for appellant.

*Stevens & Heidelberg,* and *May, Sanders & McLaurin,*
for appellee.

ANDERSON, J., delivered the opinion of the court.

Appellee filed its bill in the chancery court of Forrest
county against appellant to enjoin the latter from prose-
cuting an action at law against appellee then pending
in the circuit court of Forrest county. A temporary in-
junction was issued on the filing of the bill. There was
a hearing on motion by appellant to dissolve the in-
junction, which motion was heard by the court on bill,
demurrer, plea, and answer to the bill by appellant, and
on documentary and oral evidence taken at the hearing,
resulting in a decree overruling the motion to dissolve
the injunction. From that decree appellant was grant-
ed this appeal to settle the principles of the cause.

The only question for consideration by this court is
whether or not the subject-matter of the litigation is one

of equity or common-law jurisdiction.   If any error was committed by the court in refusing to dissolve the injunction, such error consisted alone of the fact that the chancery court assumed jurisdiction of a cause of action which was exclusively of common-law jurisdiction.   We are met, therefore, at the threshold of the case with the inhibition of section 147 of the Constitution, which provides as follows:

"No judgment or decree in any chancery or circuit court rendered in a civil cause shall be reversed or annulled on the ground of want of jurisdiction to render said judgment or decree, from any error or mistake as to whether the cause in which it was rendered was of equity or common-law jurisdiction; but if the supreme court shall find error in the proceedings other than as to jurisdiction, and it shall be necessary to remand the case, the supreme court may remand it to that court which, in its opinion, can best determine the controversy."

In such a case as this, section 147 of the Constitution is a limitation on the power of the supreme court.   And a question, therefore, is involved which this court will raise for itself where neither party raises it.   The supreme court is prohibited by the express terms of the above section of the Constitution from passing on the question and entering judgment thereon.   *Cazeneuve* v. *Curell*, 70 Miss. 521, 13 So. 32; *Goyer* v. *Wildberger*, 71 Miss. 438, 15 So. 235; *Adams* v. *Bank*, 74 Miss. 307, 20 So. 881; *Day* v. *Hartman*, 74 Miss. 489, 21 So. 302; *Illinois Central R. Co.* v. *Le Blanc*, 74 Miss. 650, 21 So. 760; *Irion* v. *Cole*, 78 Miss. 132, 28 So. 803; *Decell* v. *Oil Mill*, 83 Miss. 346, 35 So. 761; *Hancock* v. *Dodge*, 85 Miss. 228, 37 So. 711; *Mississippi Fire Association* v. *Stein*, 88 Miss. 499, 41 So. 66; *Woodville* v. *Jenks*, 94 Miss. 210, 48 So. 620; *Dinsmore* v. *Hardison*, 111 Miss. 313, 71 So. 567; *Metzger* v. *Joseph*, 111 Miss. 385, 71 So. 645; *White* v. *Willis*, 111 Miss. 417, 71 So. 737; *Cooley* v. *Tullas*, 115 Miss. 268, 76 So. 263; *Yazoo Delta Mortgage Co.* v. *Hut-*

*son,* 140 Miss. 461, 106 So. 5; *Engleburg* v. *Tonkel,* 140 Miss. 513, 106 So. 447.

It was held in the Cazeneuve case that the prohibition of Constitution was not confined to final judgments or decrees, but applied also to appeals from interlocutory decrees involving the question whether the cause was one of equity or law jurisdiction. In the Jenks case, it was held that, where an action was brought in the chancery court to recover on a purely legal demand a balance due under an alleged contract, although the chancery court had no jurisdiction, a decree overruling a demurrer to the bill on that ground could not be reversed by the supreme court.

One of the ablest opinions of the supreme court construing section 147 of the Constitution was written more than thirty years ago. We think it would be of benefit to the bench and bar of the state at this time, in this particular case, to embody in this opinion certain parts of that opinion. We quote from it:

"The record shows that this suit is really an action of trespass brought in a court of equity. The recovery is sought for an oppressive and excessive levy made by a sheriff of a writ of attachment, and is purely an action for damages for a trespass. . . .

"But the court assumed jurisdiction, and, as this is the only error assigned, or apparent, we cannot reverse the decree overruling appellant's demurrer to the bill of complaint. . . .

"We find here practical authority for the virtual obliteration of the lines of demarkation between courts of law and equity, if the judges and chancellors of the inferior courts choose to disregard, or fail to observe, those distinguishing lines. And this court is forbidden to reverse or annul decrees or judgments rendered in the lower courts, even if there was want of jurisdiction, if no other error than want of jurisdiction is to be found. That diverse and conflicting rules of practice and procedure may obtain in the several court districts is plain.

The chancery court of one district may assume jurisdiction of common-law causes, and the equity courts of the adjoining districts may refuse to entertain such jurisdiction. In the same district variant and uncertain rules and methods may obtain. The diversities of practice may be found in the same district under different chancellors or circuit judges from time to time presiding therein. It is practically within the power of the chancellors and circuit judges, under this provision of the Constitution, to virtually abrogate the distinction between courts of common-law and equity jurisdiction. We have the singular anomaly of a constitutional scheme of two courts, common-law and equity, and yet with power in the inferior judges to effectually blend the jurisdictions, each in his own district. But, remarkable as the results flowing from this anomaly are, we are not to disregard the plain requirements of the fundamental law. The court below, in the case at bar, clearly had no jurisdiction, and should have sustained the demurrer to the bill, and so have driven complainant to his common-law remedy. But the learned chancellor having entertained jurisdiction, and this being the only error committed, we are forbidden to reverse.   .   .   .

"That the inhibition laid on this court in this section of the Constitution is not confined to action on final decrees or judgments is manifest from a consideration of the startling incongruity of the civil administration which would result from adopting the construction contended for by those who would restrict the inhibition to final decrees or judgments. We shall, in that case, have the intolerable anomaly of appeals maintainable from decrees or demurrers in courts of equity, in cases where the lower court was without jurisdiction, and, in like cases, no appeals allowed from judgments of circuit courts. Surely no one can be found to insist that this absurd inconsistency of civil administration was any part of the constitutional scheme for mitigating what must have been supposed to be the evils of too rigidly

observing the bounds of jurisdiction between the courts of law and equity. . . .

"The only error assignable is the want of jurisdiction in the court below to render the decree, and, as the learned chancellor entertained jurisdiction, under section 147 of the Constitution forbidding a reversal in this court because of such error," etc.

It is true that, where the chancery court assumes jurisdiction of a cause of action cognizable alone in the circuit court, in such a case the absolute right of trial by jury of the issues of fact given in circuit court causes by section 31 of the Constitution is taken away, for our court has held that it rests in the discretion of the chancery court whether a jury shall be granted to try issues of fact. But section 147 is just as much a part of the Constitution and is just as binding on the courts as section 31 of the Constitution. They are to be construed together. Construed together, they mean that the right of trial by jury of issues of fact in civil causes in the circuit courts shall remain inviolate, except in such cases of exclusively law cognizance as the chancery courts may erroneously assume jurisdiction of, where such error of jurisdiction is the only error in the decree. In such cases the absolute right of trial by jury of the issues of fact is denied; it being discretionary with the chancellor whether such issues of fact shall be tried by a jury.

Appellant's action at law in the circuit court was enjoined by appellee in the chancery court, on the ground of the inadequacy of appellee's remedy in the circuit court. One of the original heads of equity jurisdiction was bills for injunctions by defendants restraining actions at law against them on the ground that they had defenses which the law courts could not entertain. This is that character of case. The chancery court determined for itself the question of jurisdiction. It was given that right by section 147 of the Constitution. This court, under the Constitution, is without power to cor-

rect the error, if there was error, in the chancery court so assuming jurisdiction.

*Affirmed and remanded.*

Cook, J., took no part in the decision of this case.

Ethridge, J. (dissenting).

I am unable to agree with the opinion written by Judge Anderson, and, to make my views entirely clear, it will be necessary to make a further statement of facts.

McLeod Lumber Company, a corporation of the state of Delaware, having its principal office and place of business in the city of Hattiesburg, Miss., filed a bill for an injunction against Talbot & Higgins Lumber Company, a corporation under the laws of Alabama, domiciled at Elba, Ala. The bill sought an injunction against the Talbot & Higgins Lumber Company from maintaining a suit which that company had brought in the circuit court of Forrest county for damages, for breach of a contract. The defendant set up as reasons for seeking an injunction that it had two legal claims for unliquidated damages against the plaintiff, and that said circuit court had refused to permit it to set off its claims against the claim of plaintiff in the circuit court, and also setting up that Talbot & Higgins Lumber Company was a nonresident of the state and was insolvent. The application for the injunction was presented to the circuit judge and by him granted. The appellant appeared in the chancery court and denied the allegations of insolvency and demurred to the bill on a number of grounds, and also moved to dissolve the injunction. There was no legal proof of insolvency, and the chancellor overruled the demurrer and the motion to dissolve, and granting an appeal to settle the principles of the case under section 9, Hemingway's Code of 1927 (section 17, chapter 151, Laws 1924, amending sections 9 and 17, Hemingway's Code of 1917). In this section it is provided that ap-

peals lie in the sound discretion of the chancellor, and may be granted to settle the principles of the case, etc. I do not agree with the statement in the majority opinion, viz.:

"The only question for consideration by this court is whether or not the subject-matter of the litigation is one of equity or common-law jurisdiction."

In my opinion, there are a number of questions involved in this appeal that ought to be settled, which I shall discuss during the course of this opinion.

I think, to begin with, that section 147 of the Constitution has no application to this case, for the reason that the suit was brought in the circuit court, and was pending in the circuit court, and trial had begun and had progressed to a certain stage in that court, and there is no question whatever that the circuit court had jurisdiction of the cause. This is not a case where a litigant, in the beginning of his litigation, misconceived the forum, and the cause is entertained by the court into which he goes. It is a plain case of a litigant going into the proper court seeking proper relief, and being taken from that court to the chancery court wrongfully, and an appeal granted to have the principles settled. Among the questions to be settled is whether the chancery court should proceed with the cause, whether if it should continue to entertain the cause to proceed according to the common-law rights of the parties, or whether it should ignore those rights, among which are a trial by jury, and proceed to try a legal case according to the practice of equity, and according to equitable procedure. The constitutional convention never contemplated that the courts would hold that a chancellor was above the control of the law and the Constitution. The principle sought to be accomplished by section 147 of the Constitution was to prevent the necessity of determining the jurisdiction at the end of a trial, where a case had been properly tried and the proper result reached, saving alone

that it was reached by the wrong court, and, if it was in the wrong court, to upset the just result.

In partiting the judicial powers among the courts of the state, the constitutional convention gave to the circuit court. original, general jurisdiction in all matters, civil and criminal, in this state, not vested by this Constitution in some other court, and such appellate jurisdiction as shall be prescribed by law. In section 157 of the Constitution it is provided that:

"All causes that may be brought in the circuit court whereof the chancery court has exclusive jurisdiction shall be transferred to the chancery court."

And section 159 of the Constitution specifically gives to the chancery court jurisdiction of certain subject-matter, including all matters in equity; divorce and alimony; matters testamentary and of administration; minors' business; cases of idiocy, lunacy and persons of unsound mind; and all cases of which the said court has jurisdiction under the laws in force when the Constitution was adopted. By section 160 of the Constitution, and section 161, additional, specific jurisdiction is conferred on the chancery court by the Constitution. By section 162 it is provided that all causes that may be brought in the chancery court whereof the circuit court has exclusive jurisdiction shall be transferred to the circuit court. Other courts are given jurisdiction in other specific matters.

It will be seen from a comparison of all these sections with section 147 of the Constitution that the constitutional convention did not intend to make the circuit and chancery courts control the general jurisdiction of all matters at the will of anybody. A separate scheme was clearly and specifically provided for. True the state had, at one time, between 1850 and 1860, blended the jurisdiction of the circuit and chancery courts, and administered, in one court, the remedies and relief formally given to both courts, but, evidently, this did not prove satisfactory, and jurisdictions were, thereafter, maintained in

separate courts, the circuit court to have all jurisdictions not conferred by the Constitution on some other court, and the other courts to have jurisdiction of specific matters. A chancellor is under duty to transfer common-law cases when filed in his court to the circuit court; and, in the case at bar, the chancellor desires the judgment of this court on the facts developed in the record as to whether he should proceed with the suit, or whether he should transfer it, and, if he should proceed with it, he desires directions from this court as to how he should proceed and what principles should apply, in order to decide these questions.

In the second place, the suits here involved, which are sought to be litigated in one suit in the chancery court, do not come within the mission of section 147 of the Constitution, under the doctrine announced in *Tribette* v. *Railroad Co.,* 70 Miss. 182, 12 So. 32, 19 L. R. A. 660, 35 Am. St. Rep. 642; *Telephone Co.* v. *Williamson,* 101 Miss. 1, 57 So. 559; *Hawkins* v. *Scottish Union, etc.,* 110 Miss. 23, 69 So. 710; *Scottish Union & National Ins. Co.* v. *Warren-Gee Lumber Co.* (Miss.), 61 So. 430; *Newton Oil, etc., Co.* v. *Sessum,* 102 Miss. 181, 59 So. 9; *Scottish Union, etc., Co.* v. *Warren-Gee Lumber Co.,* 103 Miss. 816, 60 So. 1010; *Indianola Compress Co.* v. *So. Ry. Co.,* 110 Miss. 602, 70 So. 703; *Robertson* v. *Greenwood Lumber Co.,* 115 Miss. 210, 76 So. 149; *Grenada Grocery Co.* v. *Tatum,* 113 Miss. 388, 74 So. 286; *Yazoo Delta Mortgage Co.* v. *Hutson,* 140 Miss. 461, 106 So. 5. The opinion in the *Tribette case, supra,* was written by the same court that wrote the opinion mostly relied upon in the majority opinion here (*Cazeneuve* v. *Curell,* 70 Miss. 521, 13 So. 32), in which Judge Campbell, speaking for the court on page 192 (12 So. 34), said:

"No question as to mistake of jurisdiction between courts of law and chancery, within the contemplation of section 147 of our Constitution, arises in this case, for, if we had only one forum armed with full power to administer all remedial justice, joinder of all these parties

in one action would not be admissible. Bliss on Code Pleading. This author says, in section 76: "Two or more owners of mills propelled by water are interested in preventing an obstruction above that shall interfere with the downflow of the water, and may unite to restrain or abate it as a nuisance, but they cannot hence unite in an action for damages; for, as to the injury suffered, there is no community of interest. There is no more a common interest than though a carrier had, at one time, carelessly destroyed property belonging to different persons, or the lives of different passengers.'"

For some years our court departed from the principles announced above from the Tribette case, but later, in *Telephone Co.* v. *Williamson,* 101 Miss, 1, 57 So. 559, returned to the doctrine of the Tribette case, and disapproved the overruling cases, and on page 7 of the opinion (57 So. 560) in the Williamson case said:

"The opinion in *Tribette's case, supra,* has received the unqualified approval of the leading text-writers, among them being High on Injunctions, Beach on Injunctions, and Bliss on Code Pleading, and of many courts of last resort, and it may justly be regarded as the leading case upon the subject, and is in accord with the weight of judicial authority, both ancient and modern."

And on page 8 (57 So. 560) said:

"It is certainly a very difficult question to decide when equity will enjoin actions at law, in order to prevent a multiplicity of suits. The rule seems to be well settled in the federal courts that there is no hard and fast rule upon the subject. *Hale* v. *Allinson,* 188 U. S. 56, 23 S. Ct. 244, 47 L. Ed. 380, and authorities cited. And it is settled beyond all controversy by these authorities that 'the single fact that a multiplicity of suits may be prevented by this assumption of jurisdiction is not enough in all cases to sustain it.'"

In *Hawkins* v. *Scottish Union, etc.,* 110 Miss. 23, 69 So. 710, on page 28 of this opinion (69 So. 712), the court said:

''The ground upon which the decree was reversed was that the cause was not one of equity cognizance, and since the forum in which the action was brought—that is, combining a number of separate and independent causes of action in one suit—was such that no court was authorized to try it over the protest of the defendants, it was not saved by the provisions of section 147 of the Constitution. Had it not been for the form of the action, although the cause was not one of equity cognizance, the decree would either not have been reversed at all, or, if reversed, the cause would have been remanded to the court which could 'best determine the controversy.' So that, when reduced to its last analysis, the dismissal of the former action was for 'matter of form,' and therefore the cause comes strictly within the langauge of the statute. But we do not understand that the action which was dismissed, in order to be duly commenced within the meaning of the statute, must necessarily have been commenced in a court having jurisdiction of the subject-matter. On the contrary, we think one of the designs of the statute, with which section 147 of the Constitution is in keeping, is to protect parties who have mistaken the forum in which their causes should be tried, who simply entered the temple of justice by the door on the left, when they should have entered by the door on the right. In the language of the supreme court of West Virginia, in *Tompkins* v. *Pacific Ins. Co.,* 53 W. Va. 484, 44 S. E. 441, 62 L. R. A. 489, 97 Am. St. Rep. 1011: 'It is a highly remedial statute and ought to be liberally construed for the accomplishment of the purpose for which it was designed, namely, to save one who has brought his suit within the time limited by law from loss of his right of action by reason of accident or inadvertence, and it would be a narrow construction of that statute to say that because, if plaintiff had, by mistake, attempted to assert his right in a court having no jurisdiction, he is not entitled to the benefit of it.' ''

In *Scottish Union, etc.,* v. *Warren-Gee Lbr. Co.,* 103 Miss. 816, 60 So. 1010, it was held in the second syllabus thereof:

"Where several insurance companies having separate insurance policies upon the same property join in a bill to set aside their several policies and to enjoin the collection of the same and the insured filed a cross-bill to enforce the same, if the original bill is not sustainable for failure to state facts sufficient to show equity jurisdiction, the cross-bill was also not sustainable for the same reason, though the trial court assumed jurisdiction, as such case is not within the terms of section 147 of the Constitution of 1890."

In *Newton Oil, etc., Co.* v. *Sessum,* 102 Miss. 181, 59 So. 9, it was held:

"Where several complainants join in a bill in chancery seeking to recover damages and the statutory penalty provided in Code 1906 section 2256, for breach of separate guaranties, on separate sales by defendant, of fertilizers at different times, a demurrer to the bill should be sustained and the bill dismissed."

It was further held that: "Neither the common-law or equity courts have jurisdiction of the cause of action, where the rights and remedies of the complainants are entirely separate, independent, and distinct, and in no court can they maintain a joint cause of action."

It was further held: "In such case there would be not only a misjoinder of parties, but also a misjoinder of causes of action, and in such case Constitution 1890, section 147, has no application."

That is precisely what is sought here, joining separate causes of action in one suit; the complainant in the injunction suit having two separate, unconnected, and entirely distinct separate demands, and the defendant in the injunction suit having another entirely distinct, separate demand. I think it will be seen from a reading of these authorities, from which I have just quoted above,

that the statements of fact in this record that the authorities relied on in the majority opinion are not applicable.

It is true that in some of these cases it was held that an appeal to settle the principles of the case was governed by section 147 of the Constitution where no question was involved save that of jurisdiction.

With due deference to the learned judges who wrote these opinions, it seems to me that they misconceived the statute granting appeals in these cases, and especially failed to take into consideration, in construing section 147 of the Constitution, sections 157 to 162, which distinctly and positively direct causes to be transferred to the proper court, when brought in the wrong court.  When a chancellor sends a case to have the principles settled, he, of course, desires to have the court advise him, among other things, whether he should comply with these sections of the Constitution and transfer the case to the proper court.

The majority opinion quotes elaborately from Judge Woods' opinion in *Cazeneuve* v. *Curell,* 70 Miss. 521, 13 So. 32 for the purpose of showing that the effect of section 147 of the Constitution was to blend the jurisdiction of the two courts.  Few people have greater admiration and respect for Judge Woods than I, but he failed to read and consider, in connection with section 147 of the Constitution, the pertinent sections I have quoted.  It is manifest from a reading of his opinion that Judge Woods favored the blending of the two jurisdictions, although the Constitution distinctly preserves to the courts separate jurisdictions.

I desire to emphatically dissent from the proposition in the majority opinion that section 147 of the Constitution modifies the guaranty of jury trial contained in section 31 of the Constitution.  In no case, so far as I have found, has this question been passed on, or decided in this court, and I have been referred to no such case either by counsel or the members of the court, in any other state having similar provisions holding that it mod-

ifies the right of trial by jury. This construction of section 147 is entirely novel, and exceedingly dangerous, in my opinion. Section 147 of the Constitution did not intend to deny any litigant any right that inhered in any cause of action. It rather intended to accord to every litigant every legal and constitutional right, and it is only where these are accorded in full by the chancery court that this court is required to affirm a judgment where the right result is reached. Under section 147, the circuit judge might entertain a cause in equity, but should he do so, I do not think any one would claim that he could deny a litigant the benefit of every equitable doctrine which the litigant was entitled to. For instance, he could not deny the right of equitable set-off where that would be proper, on the theory that such procedure was not recognized in the circuit court. He could not refuse to enforce the doctrine that he who comes into equity must come with clean hands, and that he who seeks equity must do equity, or that he who hath committed iniquity shall not have equity, etc., or other principles which do not exist at common law.

In construing a constitutional provision, we should so construe it as to carry out the purpose and intent of the Constitution. The rights secured to citizens against government should be given a liberal construction. In *Thompson* v. *Grand Gulf R. & Banking Co.,* 3 How. 240, 34 Am. Dec. 81, the court held that the object of the Constitution was to protect the life, liberty, and property of the people, and that no word of the Constitution having this effect can be rejected or disregarded in construing the Constitution, but that all such words are to have full effect.

In *Brien* v. *Williamson,* 7 How. 14, the court said: "A Constitution should be construed so as to effectuate, not defeat, the principles indicated by its framers."

The United States supreme court has frequently announced the rule as being well settled that constitutional provisions designed for the protection of persons are to

be liberally construed. *Boyd* v. *United States,* 116 U. S. 616, 6 S. Ct. 524, 29 L. Ed. 746; *Gouled* v. *United States,* 255 U. S. 298, 41 S. Ct. 261, 65 L. Ed. 647. See, also, *Falkner* v. *State,* 134 Miss. 253, 98 So. 691.

In *Smith* v. *Smith* 1 How. 102, Judge SHARKEY, speaking for the court, said: "It seems to me that this provision in the Constitution not only extends to issues of facts made up, but that it must necessarily secure the right to make up an issue; that although an issue is in most cases a prerequisite to a trial by jury, yet it does not follow that by giving a summary remedy a party can be deprived of a constitutional right. If the legislature can say in any given case that a party may recover by motion to the court, without the privilege of an issue they may, as to all matters of contract, at least, say the same thing, and thus destroy the right of trial by jury. The right of trial by jury, as it exists here, is derived from the common law, and it is so highly valuable, . . . so essential to liberty, that it is secured as a constitutional right, and must, in a government like ours, be understood to extend at least as far as it did at the common law, and, if alterations are made, policy would dictate an extension rather than a restriction of a privilege invaluable in itself, and so highly prized by the citizen."

In *Isom* v. *Mississippi Central R. Co.,* 36 Miss. 300, Judge HARRIS, speaking for the court, said: "The spirit and policy of our institutions are at war with the doctrine of legislative omnipotence. Ours is a government founded upon an express, written compact, reduced to exactitude and certainty, expressive of the sovereign will of the people, fixing the limits and marking the bounds of legislative, executive, and judicial powers; our Constitutions all originated in a spirit of distrust of governmental power, and from a conviction that, unrestrained, its tendency was to despotism. But, notwithstanding these facts, the legislative and judicial history of this country, especially in relation to these

great corporations, or whenever works of great public utility or necessity come in question, chronicles one continued series of encroachments on the rights of the citizen.   See Smith on Constitutional Construction, 443, 490.   The people of Mississippi, profiting, or rather intending to profit, by the warning examples afforded in the older states (where the limitation upon the ancient power of eminent domain had only furnished a pretext for evasion), seemed to think they had closed the door against these invasions on the rights of private property, when in their organic laws they declared, 'Nor shall any person's property be taken or applied to public use without the consent of the legislature, and without just compensation being first made therefor.'   But the natural tendency of power and wealth to accumulate inordinately, the strong proclivity of every department in popular governments, to consult the good of the many, at the expense of the rights of the few, here as elsewhere, in all time past, leave but little hope that the utmost caution, formally embodied in written Constitutions, will ever secure that perfect protection to individual right, which was designed, and is desired, by the great body of the people. Smith's Commentaries, section 335. Hence the great necessity, on the part of the judicial department, to scrutinize well, not only the conduct of the other departments, in cases appealing to it for protection against such encroachments, but especially to guard itself against the natural influences, which the clamors of the powerful many are calculated to exert.   So that the humblest, weakest citizen, claiming a legal right, may assert it, against the interests or combinations of the many, or the public even, with the full confidence that neither public necessity, public utility, nor public convenience, the pleas of all despotism, shall prevail against a single private right, secured by our Constitution and laws." *Byrd* v. *State,* 1 How. 163.

In *Wolfe & George* v. *Martin,* 1 How. 30,. it was held that a jury, within the meaning of the law, is composed of twelve men.

In *Byrd* v. *State, supra,* Judge SHARKEY, speaking for the court, said: ''As the law stood at the time of the formation of the federal government, both the common and statute law of England required the possession of a freehold as necessary to qualify a juror, and the right of trial by jury, being of the highest importance to the citizen, and essential to liberty, was not left to the uncertain fate of legislation, but was secured by the Constitution of this and all the other states as sacred and inviolable. The question naturally arises, How was it adopted by the Constitution? That instrument is silent as to the number and qualifications of jurors. We must, therefore, call in to our aid the common law for the purpose of ascertaining what was meant by the term 'jury.' It is a rule that when a statute or the Constitution contains terms used in the common law, without defining particularly what is meant, then the rules of the common law must be applied in the explanation. The framers of the Constitution must have meant, therefore, to secure the right of trial by jury as it existed in England, either by the statute or common law, and the Constitution, in the absence of all subsequent legislation, would have secured to the citizen this mode of trial and all its incidents not incompatible with the republican form of our government. The legislature cannot abolish or change substantially the panel or jury.''

In *Isom* v. *Railroad Co.,* 36 Miss. 300, it was held that the Constitution secures the right to a jury in all state cases in which, at common law, a jury trial was necessary.

In *Carradine* v. *Estate of Carradine,* 58 Miss. 286, 38 Am. Rep. 324, it was held that a jury trial in the chancery court in a case not specifically provided for by statute is discretionary, thus showing that the chancery court may have jury trials in cases tried there when conferred by law, or, if not conferred by law, within the discretion

of the chancellor. If the statute, or the Constitution, does not grant a jury trial, and the chancellor's authority to grant one is discretionary, he may disregard the verdict of the jury; but if the statute grants a jury trial, or it is granted by the Constitution, the jury's verdict is as binding upon the chancellor as upon the circuit court.

We have, by statute, provisions for a jury trial in the chancery court in cases of contested wills, and the verdicts of the jury have been uniformly treated as binding on the chancellor, as to questions so submitted to them.

In *Y. & M. V. R. Co.* v. *Wallace,* 90 Miss. 609, 43 So. 469, 122 Am. St. Rep. 321, the court held the Code of 1906 (section 4910) unconstitutional because it deprived the circuit court of power to grant defendants new trials for excessive verdicts and to authorize the supreme court alone to require *remittiturs,* and also because it denies a defendant the right to have a complete disposition of his case, by denying right of trial by jury, and Judge CALHOUN, speaking for the court, says therein: "Our own Constitution provides . . . that 'the right of trial by jury shall remain inviolate.' When this was adopted, 'trial by jury' meant a trial in court under the forms of law, with a judge presiding to direct the proceedings in conformity with it. Twelve men in the woods or on a street corner were not imagined.

Blackstone, who lived in an age when there was great necessity for trials by jury for the protection of the people from the government, in his great Commentaries on the Laws of England, in discussing trials by jury, in book 3, p. 379 (Cooley's Blackstone, p. 1139), said:

"Upon these accounts, the trial by jury ever has been, and I trust ever will be, looked upon as the glory of the English law. And if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened when it is applied to criminal cases! But this we must refer to the ensuing book of these Commentaries, only observing for the present, that it is the most transcendent privilege which any sub-

ject can enjoy, or wish for, that he cannot be affected either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals. A Constitution that I may venture to affirm has, under Providence, secured the just liberties of this nation for a long succession of ages. And therefore a celebrated French writer, who concludes that, because Rome, Sparta, and Carthage, have lost their liberties, therefore, those of England, in time, must perish, should have recollected that Rome, Sparta, and Carthage, at the time when their liberties were lost, were strangers to the trial by jury. Great as this eulogium may seem, it is no more than this admirable Constitution, when traced to its principles, will be found in sober reason to deserve. The impartial administration of justice, which secures both our persons and our properties, is the great end of civil liberty. But if that be entirely intrusted to the magistracy, a select body of men, and those generally selected by the prince or such as enjoy the highest offices in the state, their decisions, in spite of their own natural integrity, will have frequently an involuntary bias toward those of their own rank and dignity. It is not to be expected from human nature that the few should be always attentive to the interests and good of the many. On the other hand, if the power of judicature were placed at random in the hands of the multitude, their decisions would be wild and capricious, and a new rule of action would be every day established in our courts. It is wisely therefore ordered that the principles and axioms of law, which are general propositions, flowing from abstracted reason, and not accommodated to times or to men, should be deposited in the breasts of the judges to be occasionally applied to such facts as come properly ascertained before them. For here partiality can have little scope. The law is well known, and is the same for all ranks and degrees. It follows as a regular conclusion from the premises of fact pre-established. But in settling and adjusting a question of fact, when intrusted to any single

magistrate, partiality and injustice have an ample field to range in, either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder. Here, therefore, a competent number of sensible and upright jurymen, chosen by lot from among those of the middle rank, will be found the best investigators of truth, and the surest guardians of public justice. For the most powerful individual in the state will be cautious of committing any flagrant invasion of another's rights, when he knows that the fact of his oppression must be examined and decided by twelve indifferent men, not appointed till the hour of trial, and that, when once the fact is ascertained, the law must, of course, redress it. This, therefore, preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens.''

Lieber in his great work '' Civil Liberty and Self-Government,'' at page 237, in discussing the question, sets forth the benefits of trial by jury in the following language:

''It may not be improper here to enumerate all the advantages of so great an institution, whether they are directly connected with liberty or not. The trial by jury, then, if properly and intelligently administered, divides the labor of the administration of justice, and permits each part quietly to find the truth in the sphere assigned to it. It allows the judge to stand, as the independent organ of the law, not only above the parties, hostilely arraigned against each other, but also above the whole practical case before the court. It enables plain, common, and practical sense practically to admix itself with keen professional and scientific distinction, in each single case, and thus prevents the effect of that disposition to sacrifice reality to attenuated theory, to which every individual is liable in his own profession and peculiar pursuit—the worship of the means, forgetting

the end. It makes a participation of the people in the administration of justice possible without having the serious evils of courts, consisting of multitudes or mobs, or the confusion of the branches of the administration of justice, or judges and triers. It obtains the great advantage of a mean of views of facts, regarding which Aristotle said that many persons are more just than one, although each of the many were less so than the one, without incurring the disadvantages and the injustices of vague multitudes. It brings, in most cases, a decree of personal acquaintance with the parties, and frequently with the witnesses, to aid in deciding. It gives the people opportunities to ward off the inadmissible and strained demands of the government. It is necessary for a complete accusatorial procedure. It makes the administration of justice a matter of the people, and awakens confidence. It binds the citizen with increased public spirit to the government of his commonwealth, and gives him a constant and renewed share in one of the highest public affairs, the application of the abstract law to the reality of life—the administration of justice. It teaches law and liberty, order and rights, justice and government, and carries this knowledge over the land; it is of the greatest practical school of free citizenship. It throws a great part of the responsibility upon the people, and thus elevates the citizen while it legitimately strengthens the government. It does not only elevate the judge, but makes him a popular magistrate, looked up to with confidence and favor, which is nowhere else the case in the same degree, and yet is of great importance, especially for liberty. It is the great bulwark of liberty in monarchies against the crown. It stands, in republics, as a committee of the people, between the accused and the people themselves, a more exacting king when excited than one that wears a crown. It alone makes it possible to decide to the satisfaction of the public those cases which must be decided, and which, nevertheless, do not lie within the strict limits of the posi-

tive law. It, alone, makes it possible to reconcile, in some degree, old and cruel laws, if the legislature omits to abolish them, with a spirit of humanity which the judge could never do without undermining the ground on which alone he can have a firm footing. It is hardly possible to imagine a living, vigorous, and expanding common law without it. It is with the representative system one of the greatest institutions which develop the love of the law, and without this love there can be no sovereignty of the law in the true sense. It is part and parcel of the Anglican self-government. It gives to the advocate that independent and honored position which the accusatorial process, as well as liberty, requires, and it is a school for those great advocates without which broad popular liberty does not exist.''

Trial by jury has the power to protect the people in, at least, three relations; the relation of justice, the relation of law, and the relation of liberty. In my essay on jury trials I have discussed it under these heads. I desire to quote a part of the relation to justice:

''The advantages of jury trial to private litigants in their private controversies is great, because it prevents partiality, bias and prejudiced judgment, and protects them and their property, because the questions to be decided must pass through the minds of twelve good and lawful men, men who have been described in our statutes as men of good intelligence, sound judgment, and 'fair character, each of whom must be examined prior to his being selected, and must state upon oath that he is fair and impartial, and can render a verdict according to the laws and the evidence produced before him. Jurors are taken from the county where the parties live. They therefore know something of the general character of the respective parties and their trustworthiness as witnesses. They come from the varied callings of life, and from the various conditions of men in society, and whatever prejudices one may have against a litigant, or against a lawsuit, or any other thing that influences the mind improp-

erly, which has not been disclosed by a searching examination on the *voir dire*, must be considered by his fellow jurors, some of whom may have a contrary predilection, bias, or prejudice, and it is rare that a particular prejudice, bias, or leaning would influence all members of the jury who must agree on the verdict. If men are, in fact, what the law designs them to be, 'men of good intelligence, sound judgment, and fair character,' it will be impossible to get unfair and partial verdicts. Of course, it is impossible to make any human institution perfect, but the jury system, properly administered, approximates that standard as nearly as any system possibly could. These jurors have a sense of right and wrong, of natural justice, and realize that they are accountable or responsible to the court of public opinion for their acts, and, as a rule, they desire when they are fairly selected, to do the right thing, and, where questions of right and wrong pass through many minds and meet a common concurrence, it is more naturally apt to be correct and just than when it passes through a single mind, even though that single mind may be specially prepared and in a person of unimpeachable probity of character.''

I regret exceedingly to see these securities of the people impaired, and regret to see a construction placed upon our Constitution which will enable a chancellor to override the Constitution at will. A chancellor of course is like other men, subject to the same imperfections that every man is subject to. He has his prejudices and is unable to rise above them completely, and these prejudices will evidently be felt and seen in the decree, although he is unconscious thereof.

Trial by jury has long been cherished as one of the greatest securities of human rights, as is shown whenever excessive tyranny has undertaken to trample the people under its feet. Venerable institution and friend of the common people, you have had a long and useful life! For more than a thousand years you have stood as a knight of honor, guarding the people's rights and re-

dressing their wrongs! You have limited the power of rulers and modified the austerities of legislation! You have tempered justice with mercy and technicality with common sense! You have been the master of despots and the counselor of legislatures! You have been the guardian and best friend of liberty through these thousands of years! Where you have existed, there liberty has survived the onslaughts of its foes. Where you have not lived, there tyranny has ruled the people with an iron hand and trampled their rights in the dust of degradation! You have been the most valient and successful defendant of the citadels of freedom! But the day of your destiny has ended and the star of your fate has declined! From your lofty standing, you have been hurled down to be trodden upon by the mighty chancellor! Like Humpty Dumpty, you have had a great fall! Like the negro's gelded hog, you have lost your standing in the community! You have been emasculated in the *sanctum sanctorum* of the temple of liberty! Like Caesar, you have been wounded by those you thought were your best friends! From now on, instead of being a captain to command, you have been relegated to the position of mere adviser to the chancellor and your advice may be disregarded and your counsel spurned, and it will be on many occasions, I deeply regret your misfortune and the state's vanishing rights. May God, in His wisdom, cause you to be re-established in your former position of umpireship in the courts where the rights of men are in dispute.