REASON, et al. *v.* REASON, et al.

May 11, 1953

No. 38768        31 Adv. S. 10        64 So. 2d 637

*Corban & Corban* and *Laub, Adams, Forman & Truly,* for appellants.

*C. F. Engle, W. E. Gore* and *Berger & Callon,* for appellees.

LEE, J.

This controversy was over thirty-seven acres of land, the title to which was vested in "Alfred Reason." Actually there were two Alfred Reasons—father and son—senior and junior. The father, at the time of his death, left three sons, Alfred, Jr., Peter, and Freeman, his sole heirs at law. Various and sundry mineral leases and

royalty interests, stemming from several different sources, were outstanding on this property. A bill of complaint was filed by Alfred Reason, Jr. and those claiming through him, against Peter and Freeman Reason, their heirs and assigns. A realignment of the parties complainant and defendant was effected so as to place each on his proper side. The issue then presented by the pleadings and the proof was whether the land was the property of Alfred Reason, Sr., deceased, or whether it was, in fact, the property of his son, Alfred Reason, Jr.

Complainants' motion for a jury trial, objected to by the defendants, was granted, and the verdict of the jury was for the complainants. The defendants then moved to set aside the verdict and enter a decree for them. This motion was sustained, the court made a finding of fact that the land belonged to Alfred Reason, Sr. at the time of death, and entered a decree adjudicating the rights of all parties accordingly. From that action, the complainants appealed.

The documentary evidence showed that this land was conveyed to D. and J. S. Laub by Eva Stowers Latham and husband on January 11, 1919, for a consideration of $500; and that Jake S. and Celia Laub, devisees of the will of D. Laub, for a like consideration, on October 19, 1921, conveyed it to "Alfred Reason". On November 1, 1924, Alfred Reason and wife "Merinda" executed a mortgage thereon to secure the payment of $200 to G. O. Korndoffer, which was cancelled on November 23, 1924. The authority to cancel requested the chancery clerk to "cancel the two enclosed mortgages as Alf Reason has paid me in full." Only the deed of trust, dated November 1, 1924, was made a part of this record. On February 2, 1930, Alfred Reason and wife, "Malendy" Reason, executed a mineral lease to Britton & Koontz Company, Inc. on this land, according to a metes and bounds description, estimating it to contain thirty-seven

acres, and the instrument was filed for record on April 4, 1930.

On both the 1919-1920 and 1921-1922 assessment rolls, the name of the owner of this land was changed from D. Laub & Son to Alfred Reason, and it was assessed thereafter to "Alfred Reason, Sr." through and including the rolls of 1938-1939. The duplicate tax receipts, except for two or three unaccounted for, showed payment of the taxes on this land in the name of Alfred Reason, Sr. from 1923 through 1938.

For the complainants, Mrs. Eva Stowers Latham testified that Alfred, Sr. approached her and her husband about buying this land for his son, who was in the army, saying that the son had either sent, or was going to send, money for that purpose, and that he wanted to buy it as a home for the son. The deed was made to the Laubs, who were going to make Alfred, Sr. a loan, as he had spent some of the money and did not have enough to make full payment. W. W. Lisbony testified that Alfred, Sr. said his son, in the army in France, had sent him some money; that he had more money in his pocket than he had ever had before; and that he was going to buy some land for his son from Bob Latham, if he could. Several times he said that he was glad his son got the land, and that he moved on the place because there was no use for him to pay rent, when he could move on his son's place and not do so. Lewis Earl Guedon testified that Alfred, Sr. told him that his son in France had sent some money; that he was going to buy his son a place, he hoped, from Bob Latham, although he did not have all of the money. Later he complained about paying rent and said he wanted to move on his son's place.

Alfred Jr.'s wife, Julia, testified that he sent money to buy the land; he came home in 1919; they were married in 1920; Simon Selman, the tenant on the place, paid all rent to her and her husband, and none to Alfred, Sr.; she and her husband furnished the money to pay

the taxes; the money from Korndoffer was borrowed through her husband and Alfred, Sr.; and her husband signed for it. She admitted that Malinda was her husband's mother, and that Alfred, Jr. was in France only thirteen months and received $21 per month as a private. She testified further that her husband was a good "crap shooter"; that Alfred, Sr. told her the boy sent him $532; that the property was his son's; and that the reason why the father moved on the place was because he was old and unable to pay rent. Adolph Wagner considered that the land belonged to the son and testified that everybody in the neighborhood recognized him to be the owner.

On the contrary, the oral evidence for the defendants was to the following effect: Floyd Wood, living within a quarter of a mile of the land, testified that Simon Selman rented from Alfred, Sr.; that the father paid the taxes, and that on several occasions he carried the money to the sheriff's office. He never heard of Alfred, Jr. making claim to the land until after his father died. Mrs. Minnie E. Latham testified that this land joined a place which she at one time owned. In conversations with Alfred, Jr., he recognized his father's ownership. "Old Alfred and his wife" were respected colored folks and would not have given a mortgage unless they owned the land. She was positive that it belonged to the father. Frank Torrey, living nearby, had heard no claim by the son. The father built a small house for the son when he and his wife moved on the place, after the mother's death. He was informed by Alfred, Sr. that Selman paid the rent to him, that he himself paid for the land, and that he bought the lumber for Alfred, Jr.'s house.

Coley Bynum, living a short distance away, testified that Selman rented the place from the father, and he saw Selman deliver the rent on several occasions. Shortly after his marriage, Alfred, Jr. told him that his father bought the land and owned it. Clarence Reason, a half-brother, testified that Alfred, Jr. admitted to him that

his father owned the property, and that Selman had stated that he rented the property from the father. E. B. Scott testified that Alfred, Jr. told him that his father owned the land. Several of the above named witnesses testified that, according to general reputation, Alfred, Sr. was the owner.

R. Appleton Owen, circuit clerk, testified that Alfred, Jr., in applying for a pension, said that he had a one-third interest in this land. Roy B. Smith and T. E. Hennington testified to Alfred, Jr.'s execution of an affidavit, which was attached to the defendant's answer, in which he claimed only a one-third interest in this land.

From the foregoing resume of the evidence, it will be seen that there was no proof of delivery of the deed to anyone other than the father. He was evidently the Alfred Reason, grantee, in the deed from the Laubs. Beyond doubt it was he, who mortgaged the land to Korndoffer in 1924 as the instrument shows that his wife was "Merinda", manifestly intended for "Malinda." Obviously he was the Alfred Reason who executed a mineral lease to Britton and Koontz Company in 1930 because the name of his wife in the body of the instrument was "Malinda", although her signature was written "Malendy". He lived on the property for at least thirteen years before his death. The assessment was in his name, and the taxes were paid in his name. Several witnesses testified that the property was generally recognized as his. The son told the circuit clerk that he owned only a one-third interest. He also made affidavit that his father owned the property at the time of his death; that affiant had a one-third interest at that time; and he neither denied the execution thereof nor attempted to explain it. Besides, he admitted to several other persons that his father was the owner.

Against this thoroughly reasonable claim that the father owned the property was the contention that the father sought to purchase land with money which the

son had forwarded from France; and, in spite of the fact that his gross pay at $21 a month would have aggregated only $273, his wife testified that her father-in-law admitted to her that he had received $532 from Alfred, Jr. The fanciful reason by which she accounted for her husband's acquisition of that amount of money was that she found out, after their marriage, that he was a good "crap shooter", thus suggesting as a possibility that he might have obtained the money in that way. Her testimony that Alfred, Jr. signed the mortgage was in conflict with the mortgage itself. Her statement that she and her husband paid the taxes was also in conflict with the records, which showed payment in the name of Alfred, Sr. Her testimony was also in conflict with that of several other witnesses with regard to payment of rent by Simon Selman.

Appellants assign as errors and argue that the trial court erred (1) in setting aside the verdict of the jury and entering a decree for the appellees; (2) in allowing Appleton Owens to testify to a privileged communication; (3) in giving full weight to the affidavit of Alfred Reason, Jr.; (4) in entering a decree after the death of Henry W. Marks and prior to the revivor of the action; and (5) in entering the final decree which, they assert, was against the overwhelming weight of the evidence.

As to point (1), the answer is that, under Section 1275, Code of 1942, the court was authorized, in its discretion, to allow a jury to try the issue. But since the granting of a jury trial is wholly discretionary, the court "may disregard the finding of the jury when made". Griffith's Mississippi Chancery Practice, Section 597, p. 668. See also Griffin v. Jones, 154 So. 551 (Miss.); Studdard v. Carter, 120 Miss. 246, 82 So. 70; Pittman v. Lamb, 53 Miss. 594.

As to point (2), there was no error because the court limited the evidence of this witness to the declaration of Alfred, Jr., that his interest in the land was only a

one-third. When, by his bill, he was claiming all of the land, it was competent to show that on June 1, 1950, he was claiming only a one-third thereof. This was a statement against interest, and was not a privileged communication. Cf. Martin v. Martin's Estate, 63 So. 2d 827, (Miss.); Ball v. Martin, 63 So. 2d 833, (Miss.).

As to point (3), it is sufficient to say that the affidavit was sworn to on October 10, 1950, and declared that the father owned the full estate at death, and affiant owned a one-third interest therein. It was attached to the answer. Alfred, Jr. had the right to testify that he did not sign it, or that it was obtained by fraud, or to explain wherein it would not constitute a statement against interest, or to mitigate the effect thereof. Since he did not open his mouth on the subject, during the trial, there was no reason why the court should not accept it at its face value.

As to point (4), it must be remembered that Marks had aligned himself with the complainants. The trial was concluded, the jury reported, and the cause was taken under advisement, on October 23, 1951. While he died on November 18, 1951, the suggestion of death was not filed until February 27, 1952, the date on which the chancellor filed his findings of fact. In other words, the case had actually been concluded except for the clerical matter of entering the decree. The lapse of time from the date of death to the date of the findings was sufficient to constitute a waiver. Christain & Craft Company v. Dantzler Lumber Company, 78 Miss. 74, 28 So. 788. Besides, a motion in this Court to revive in the name of Mrs. Emma M. Marks, as widow, residuary legatee and devisee, and executrix of his estate, was sustained on January 19, 1953, and she is thus before this Court, fully representing the interest of the decedent. With all proper parties now before the Court, it would be a vain thing to remand this cause for correction of a mere defect in the decree. Burton v. Redmond, 211 Miss. 158, 51 So. 2d 210.

From what has already been said, it is clear that the decree was not only not against the great weight of the evidence, but on the contrary, is fully sustained by the preponderance of the evidence, and it follows that point (5) is not well-taken.

The decree appealed from should be, and is, affirmed. Affirmed.

*McGehee, C. J.,* and *Hall, Holmes* and *Arrington, JJ.,* concur.