MATTHEWS, et al. *v.* THOMPSON, et al.

No. 40459 May 20, 1957 95 So. 2d 438

*G. J. Thornton,* Kosciusko ; *Vardaman S. Dunn,* Jackson for appellants.

*Crawley & Ford, Crawley & Brooks, John D. Guyton,* Kosciusko, for appellees.

264

Lᴇᴇ, J.

This litigation grew out of the collision of two automobiles on State Highway No. 12 in the corporate limits of the City of Kosciusko, in Attala County, in the early evening of March 19, 1955. William H. Leslie, Sr., with one guest, his brother-in-law S. E. Brunt, was driving east in a Plymouth. Wilbur Y. Kerr, with his wife, Mrs. Lillie D. Thompson Kerr, and two children, and K. B. Fowler, Jr., and his wife, Mrs. Mary Lucy Fowler, and his son, Jan Davis Fowler, and another child, in a Chevrolet sedan, was driving west. Both occupants of the Plymouth were killed. In the other car, Wilbur Y. Kerr and Jan Davis Fowler were killed, and Mrs. Kerr, Mrs. Fowler and K. B. Fowler, Jr., were seriously injured.

All of these people lived in Attala County, and thereafter letters of administration on the Estate of Leslie, Kerr, and Jan Davis Fowler were issued by the chancery court of that county.

Five separate suits, numbered 10,799, 10,800, 10,801, 10,865 and 10,866, with D. M. Thompson Administrator of the Estate of Wilbur Y. Kerr, Deceased, K. B. Fowler, Jr., Administrator of the Estate of Jan Davis Fowler, Deceased, Mrs. Lillie D. Thompson Kerr, Mrs. Mary Lucy Fowler, and K. B. Fowler, Jr., as complainants, were filed in the Chancery Court of Attala County to recover damages for these deaths and personal injuries. The named defendants were Mrs. Lila Maude Leslie, Administratrix of the Estate of William H. Leslie, Sr., Deceased, W. C. Matthews and H. M. Whitfield, partners, doing business as N & W Construction Company, residents of Lee County, and Walter S. Ables, their foreman, a resident of Attala County, Colonial Life and Accident Insurance Company, a foreign corporation domiciled in Columbia, S. C., but doing business in this State, and Homer A. Moore, a resident of Attala County.

The pleadings were elaborate. Briefly stated, the bill of complaint in No. 10,799 charged that M & W Construc-

tion Company, through its agent Walter S. Ables, and other servants, for sometime prior to March 19, 1955, in performing a contract with the City of Kosciusko for the construction of certain sanitary sewerage improvements, had been working along the south shoulder of Highway No. 12 at or near the place where the collision of these automobiles occurred; that they had erected a large mound or mounds of dirt adjacent to the pavement, which obstructed the view of a driver as he would be proceeding east around the curve on the highway; that, without any right or authority, they negligently obstructed a part of the paved portion by setting on the south edge of the pavement a mechanical pump with which they pumped water from a sandpit or excavation in order that it might drain east down the highway; that they permitted dirt, sand and slush to cover the south portion of the traveled highway; that this condition had existed for several days; that warning flares were insufficient in number and irregularly placed; that the partial blocking of the highway, under these conditions and especially in the nightime, made the highway at and near the scene of the collission hazardous and dangerous, which condition they well knew, or in the exercise of reasonable care, ought to have known; that a driver, approaching from the west, because of the obstruction of his view from the mound of dirt, the location of the pump, the flares and the sand and slush, would think the south lane was blocked or the traveled portion was farther to the north and would turn to his left in order to pass such obstructions; that such action on the part of a driver was reasonably foreseeable; that these defendants continued to maintain the hazardous and dangerous condition for several days; that on the occasion in question, William H. Leslie, Sr., approached from the west at an excessive rate of speed, and, on account of the obstructions, as stated, and in an effort to avoid them, he turned his automobile to the left, lost control thereof, and col-

lided head-on with the automobile, which was driven with reasonable care by Wilbur Y. Kerr in his proper lane; and that the concurrent negligence of M & W Construction Company, and its foreman Ables, and Leslie proximately caused and contributed to the collision of the automobiles, with the consequent fatal injuries to the decedent.

It was further charged, on information and belief, that Leslie, at the time, was an agent of defendant Colonial Life and Accident Insurance Company, and was acting within the scope of his duties and employment and in furtherance of the business of his employer, and that Leslie's negligence was both his own and that of his employer; that defendant Homer A. Moore had in his hands money of the Insurance Company, and it was charged, on information and belief, that he had other moneys and effects of the Company, and was indebted to it. There was a prayer for an attachment, under Section 2729, Code of 1942, and for discovery from him as to the amount thereof and of other money and effects coming into his hands, and for discovery from Colonial Life & Accident Insurance Company as to the true relationship between it and Leslie, of which it had exclusive information, and which the complainant had requested, and which the Insurance Company had refused.

By separate motions all defendants, except Homer A. Moore, set up that there was no equity jurisdiction involved, but that the suit was grounded in tort, and they asked for transfer of the cause to the Circuit Court of Attala County, as they were entitled to a jury trial under Section 31 of the Constitution, where the questions of negligence and contributory negligence could be submitted to a jury. In addition, Colonial Life & Accident Insurance Company said that, although it is a nonresident, it has been domesticated; that Homer A. Moore was not its agent and had none of its moneys or effects; that it

had furnished complainant all information which he sought; and that the suit in chancery was an effort to deprive it of the right of a jury trial. By his separate answer, Homer A. Moore denied that he had $10 of the Insurance Company's money, or any other property at the time of the service of the writ; but admitted that he had $23 which he had collected from W. C. Blackwelder, who had submitted an application for insurance to the company, but that the application was subsequently rejected.

Issue was taken on the motion of the Insurance Company and Moore's answer. The complainant offered evidence, and at the conclusion thereof, the same were overruled. The court also overruled all motions to transfer to the circuit court.

The answers of M & W Construction Company and Ables, while admitting that they had been working along the south side of the highway, denied all material allegations of the bill and especially that the mound of dirt obstructed the view, or that sand or slush or the pump was on the highway, or that their acts in any way contributed to the collision. They admitted that Leslie was driving at an excessive rate of speed, more than 60 miles an hour, in a restricted zone, and denied that he lost control of his car because of anything done or omitted by them. They charged that he was under the influence of intoxicating liquor and that the collision was the sole proximate result of his negligence.

Mrs. Lila Maude Leslie, Administratrix, filed her separate answer in which she denied in detail that Wilbur Y. Kerr was killed as a result of any negligence on the part of Leslie, or that Leslie was operating his automobile at a speed of 60 miles an hour. She admitted that, as Leslie drove around the curve, his view was obstructed by large piles of dirt, and that the pump on the pavement and the nearby flare could not then be seen; that as he

came suddenly upon the pump and flare, he was confronted with an emergency, created by the negligence of M & W Construction Company and Ables, and that in the exercise of the best judgment of which he was capable, under the circumstances, he turned his car to the left to avoid the obstruction, and thereafter collided with the Kerr car. She made her answer a cross bill, and against D. M. Thompson, Administrator of the Estate of Wilbur Y. Kerr, W. C. Matthews and H. M. Whitfield, doing business as M & W Construction Company, and Walter S. Ables, as defendants, she adopted and alleged all of the affirmative matters set out in her answer. In effect, she alleged against M & W Construction Company and Ables all of the affirmative matters in her answer and the acts of negligence with which they were also charged in the bill of complaint of D. M. Thompson, Administrator. These matters and acts included the large piles of dirt, the obstruction of the view therefrom, the position of the pump on the highway, the negligent placing of the flares, the condition of the highway from dirt and slush; and the appearance to an east bound motorist that the paved portion of the highway was farther to the north than it actually was. She alleged that Leslie, having S. E. Brunt as a passenger, was driving in a careful manner at a speed of about 30 miles an hour; that the automobile of Kerr was heavily loaded, and, as it approached the curve, he increased his speed in excess of 30 miles an hour; that when Leslie was suddenly confronted with the hazard in the road, in the exercise of judgment as a reasonable person, he cut his car to the left in order to avoid a collision with the pump and to follow what he thought was the south traffic lane, and that he was guilty of no negligence when he thereupon collided with the Kerr automobile. She prayed for an award of damage as compensation for the loss of her husband.

The answer of D. M. Thompson, Administrator, to the cross bill admitted the blocked view of the road, the exist-

ence of the pump and other circumstances as already charged in his original bill, and that Leslie, in the exercise of reasonable care, would turn his car to the left to avoid the obstructions, but alleged that he was negligent at the time in driving his car at an excessive rate of speed.

The answer of M· & W Construction Company and Ables to the cross bill denied all the allegations in detail, charged that both automobiles were being operated in a restricted zone at an unlawful rate of speed, and affirmatively charged that Leslie was driving while under the influence of intoxicating liquor and that the sole cause of the collision was the gross negligence of Leslie.

The answer of Colonial Life and Accident Insurance Company to the cross bill, in effect, concurred in practically all denials and admissions as set out in the answer and cross bill of Mrs. Lila Maude Leslie, Administratrix. In addition it was denied that Leslie was acting as its agent, or that it was liable for any negligence of his.

Separate motions by all original defendants for trial by jury were overruled.

The pleadings by the complainants and the defendants in the other four cases followed the same pattern, except that there was no cross bill in any of them. The court, in like manner, overruled the several motions as to jurisdiction and for transfer to the circuit court for jury trials. The causes were then consolidated and tried together. At the conclusion of the evidence for the complainants, their attorneys and the attorneys for Mrs. Lila Maude Leslie, Administratrix, and the attorneys for Colonial Life and Accident Insurance Company announced to the court that they had agreed upon a settlement whereby these defendants would pay to the complainants for covenants not to sue the following amounts: D. M. Thompson, Administrator, $4,000; K. B. Fowler, Jr., Administrator, $3,000; and Mrs. Lillie D. Thompson Kerr $2,000; Mrs. Mary Lucy Fowler $2,000; and K. B. Fowler, Jr., $2,000.

At the conclusion of the evidence for the defendant and cross-complainant Mrs. Lila Maude Leslie, Administratrix, her attorneys and the attorneys for D. M. Thompson, Administrator, announced to the court that the Estate of Wilbur Y. Kerr had paid to the Administratrix of the Estate of William H. Leslie, Sr., the sum of $3,000 for a covenant not to sue. In all instances the parties preserved their rights and causes of action against M & W Construction Company and Ables. At the conclusion of all of the evidence, the court prepared and filed in writing detailed and elaborate findings of law and fact to the following effect:

Highway No. 12 is a completed highway and a main artery of traffic. M & W Construction Company, in accordance with its contract with the City of Kosciusko, was laying a sewer line on the south side of Highway No. 12 with Walter S. Ables as superintendent;

The collision occurred between 7:20 and 7:30 P. M. March 19, 1955; and at 7:00 o'clock that evening, William H. Leslie, Sr., had been talking to G. A. Renacker in Durant, 19 or 20 miles from Kosciusko, at which time he had not been drinking any whiskey whatever, and he was sober at the time of the accident;

The speed limit, at this place, was 30 miles an hour for west bound traffic and 40 miles an hour for east bound traffic. Kerr was driving 35 or 40 miles an hour and Leslie was travelling approximately 45 miles an hour, and both of these drivers were guilty of contributory negligence;

M & W Construction Company and Ables piled a large mound of dirt six to eight feet high just off of the south side of the pavement in a curve, which curved southward and which obstructed Leslie's view as he traveled east. They placed a mechanical pump approximately 18 inches onto the pavement on the south side and about 30 feet east of the mound of dirt. They scattered mud and sand on and across the highway both east and west of and at

the place where the pump and mound of dirt were located; and for a distance of 135 feet east this sand and dirt covered the south lane to such an extent that it was dangerous to the traveling public. They piled lumber and timbers on the north shoulder of the highway, one of which was next to the paved portion, and they placed a flare at this point and others also east thereof, and such flares were burning on this occasion. The shoulder on the south side was soft. They placed a flare just west of the mechanical pump and on the pavement, and others on the pavement and just south of the paved portion, and these flares were burning on that occasion. They placed a warning sign a considerable distance west of the pile of dirt on the south side, and another a considerable distance east of the impact of the cars on the north side, but such signs were so covered with mud and dirt that they were not readily readable by a traveling motorist. They were guilty of negligence, under the circumstances, in allowing the road to be in a dangerous condition; and because of this condition, Leslie, when he came upon the pile of dirt, pump and condition of the road at this place, could not see the west bound traffic, lost control of his car, came onto the north side of the highway, and collided head-on with the automobile of Kerr, who did everything, under the circumstances, that he could have done to avoid the collision. The collision would not have occurred if these defendants had discharged their duty with reference to the highway in a lawful and prudent manner.

The court found that Kerr was 40 years of age, with an expectancy of 31.4 years, earning $6,000 to $6,500 a year, and his wife and two children, aged 7 and 4 years respectively, were deprived of his society, companionship and support; that Jan Davis Fowler was 2½ years old, with an expectancy of 65.9 years, and that his father, mother and brother have been deprived of his society and companionship; that William H. Leslie, Sr., was 59 years of age, with an expectancy of 16 years, with earnings in

excess of $5,000 a year and left his widow and a son 35 or 40 years of age; that he and his wife, after their reconciliation, lived a happy life and he contributed to her support, and that she is now deprived of his support, society and companionship.

After considering the contributory negligence, attributable to the Kerrs and Leslie, the court adjudged the liability of M & W Construction Company and Walter S. Ables, jointly and severally, as follows: To D. M. Thompson, Administrator of Estate of Wilbur Y. Kerr, $60,000; K. B. Fowler, Jr., Administrator of Estate of Jan Davis Fowler, $17,000; Mrs. Lila Maude Leslie, Administratrix of Estate of William H. Leslie, Sr., $20,000; and to Mrs. Lillie D. Thompson Kerr, Mrs. Mary Lucy Fowler, and K. B. Fowler, Jr., all of whom were shown to have sustained serious and permanent personal injuries, $30,000, $20,000 and $17,000 respectively. These amounts were all reduced by the amounts of the settlements, made during the trial, and which have been heretofore mentioned. Final decrees were entered accordingly, and M & W Construction Company and Ables have appealed.

The appellants assign and argue that there was no substantial evidence upon which to predicate liability against them; that the decrees of the court, in sustaining both the complaints and the cross-complaint were against the great and overwhelming weight of the evidence and were contrary to law, equity and good conscience, and the court erred in failing to dismiss them; that the court erred in exercising jurisdiction, in refusing to transfer the cases to the circuit court, and in finally refusing to grant a trial by jury in the chancery court. Certain phases of these assignments will be particularized and dealt with subsequently.

There is no dispute that, for sometime, M & W Construction Company had been performing a contract with

the City of Kosciusko in laying sewer lines south of highway No. 12 about 8 to 14 feet from the pavement. They encountered trouble with quicksand and utilized a pump or pumps to remove the sand and slush from the excavation. They placed a pump at or near the large mound of dirt, which was about 100 feet west of a manhole, and caused this sand and slush to run down the south side of the pavement for about 135 feet so that it would not flow back into the manhole. Vehicles of the appellants, going onto and off the pavement near the mound of dirt deposited dirt on the pavement. The curve in the road, for one going east, was to the right and was substantial; and the mound of dirt, variously estimated at from 6 to 10 feet in height, was adjacent to the pavement at the steepest part of the curve. Because of weather conditions, the appellants closed down their work at the end of the day on Thursday before this collision occurred Saturday night, and they did not work again until the early part of the next week. When the appellants were at work, at times they would place warning signs in the highway several hundred feet both east and west of the construction. At night these signs would be moved to the side of the road, and would be lighted by flares, just as flares were also placed on both sides of the road for some distance east of the mound of dirt.

It is necessary to summarize the evidence, pro and con, as to whether Leslie was under the influence of intoxicating liquor, as to the speed of the two cars, as to the condition of the highway at and near the scene of the collision, and as to the proximate effect of that condition on Leslie, in order to determine whether or not the court had before it substantial evidence upon which to base its findings of fact, and to determine whether or not such findings were contrary to the overwhelming weight of the evidence and were manifestly wrong.

WHETHER OR NOT LESLIE WAS INTOXICATED.

Mrs. Lila Maude Leslie admitted that her husband, after an injury in 1952, got to drinking too much, and, on July 2, 1954, she filed a bill for divorce in order to bring him to his senses. Her strategy worked. After living apart 2 or 3 weeks, he came back, promised to quit drinking, did quit, and she never saw him take a drink since. Several people, both men and women, testified that, after this reconciliation, Leslie's reputation for sobriety was good. Witnesses, first at Rolling Fork and then at Mayersville, with whom he had business engagements, testified that he was not drinking from early afternoon until 4 o'clock. It was between 95 and 100 miles from the latter place to Durant, where according to G. A. Renacker, he talked to Leslie from 6:45 to 6:55, and he was not drinking at that time. It was between 19 and 20 miles from Renacker's home to the place where the collision occurred between 7:20 and 7:30.

Against this evidence was the finding, under Brunt's feet on the floor board of the car, of bottles, which had contained whiskey, and the testimony of O. E. Ellis that Leslie and a man with him drank some liquor in his tavern between 5:00 and 5:30 o'clock, which time he later changed to 6:30 to 7:00, but that he was not drunk. This witness admitted that he had been convicted of possessing intoxicating liquor, and that he had recently paid the fines of certain employees who were caught while working for him. The circumstances pointed more strongly to Brunt than Leslie as the owner of the liquor in the car; and the credibility of Ellis was somewhat impaired by his convictions. On this disputed issue of fact, the chancellor was justified in finding that Leslie was not under the influence of liquor at the time of the collision.

## THE SPEED OF THE TWO AUTOMOBILES.

 █ Eswin Dean, Bill Dodd, Mrs. Lila D. Kerr, Mrs. Mary Lucy Fowler, K. B. Fowler, Jr., and Marion Dees made different estimates as to the speed of one or the other cars. The speed of the Chevrolet was placed as high as 60 miles and as low as 5 to 10 miles. The speed of the Plymouth was placed as high as 60 miles and as low as 40 miles. Both cars came to rest practically where they hit. Before the impact, the Chevrolet had laid down skidmarks for 72 feet on the left and 50 feet on the right side. Obviously the weights of the cars themselves were about the same, but the load in the Chevrolet, four adults and four children, was heavier than the two adults in the Plymouth. This fact, plus the resistance of the Chevrolet's brakes, tended of course to neutralize a greater speed of the Plymouth. On this sharply disputed issue of fact, it cannot be said that the finding of the chancellor that Leslie's speed was approximately 45 miles an hour and Kerr's was 35 to 40 miles is against the great weight of the evidence or manifestly wrong.

## CONDITION OF HIGHWAY AT THE TIME.

 █ Marvin Harris, a highway patrolman, who had been stationed in Attala County for several years, followed the ambulance to the scene of this tragic accident. He gave attention first to the dead and injured and then made a thorough investigation of the scene. He said that the left wheels of the Plymouth at the point of impact were 2½ or 3 feet north of the center line. There were no skidmarks behind it. Such marks of the Chevrolet were 72 feet long on the left and 50 feet on the right. The position of the cars could indicate that the Plymouth was turning to its right. On the right floor board of the Plymouth, where Brunt was sitting, he found a pint bottle of whiskey with a small amount taken out, an empty pint, and a broken but unopened fifth. He observed

mounds of dirt on the south side, one of which was more than 6 feet tall. Near this mound of dirt he saw the pump. It was definitely on the pavement. He measured from the center of the 21 foot pavement to the pump and the distance was 9 feet. Sand and dirt were on the south side of the paved portion of the highway from the pump east for a distance of 135 feet and this could obstruct traffic. There was a warning sign 125 or 130 yards west of the pump, but there were no flares between it and the one on the pavement beside the pump. In the 135 feet from the pump east there were 7 flares, all of which were on the pavement. It was 336 feet from the pump to the point of impact, and there was a flare 72 feet east of this point on the south side and several more near Peachtree Street, which was about 186 feet east of the place of impact. There were 5 flares on the north side from about opposite the pump and extending east. A motorist, driving east, would have his view completely cut off by the large mound of dirt in the deepest part of the curve, and a car coming from the east would be ascending a small hill. He had passed this project many times, and had seen the contractor discharging seepage upon and down the highway. A majority of the automobiles going east would pull over to the center as they went around the pump. He caught himself doing the same thing, even though he was familiar with the place, but he did not actually go across the center line. He said that the flares on the pavement on the south and those on the north side, 8 to 10 feet from the pavement, created an optical illusion, causing a motorist, who was driving east, to think that the traveled portion was farther to the north than it actually was. It so appeared to him at times, even though he was familiar with the condition. He had never seen the contractors clean off the pavement after they quit work. He testified as to differences of conditions obtaining the night of the collision with those which obtained on Sunday morning between 10 and 11 o'clock, as shown in cer-

tain photographs which were taken on that and later occasions.

Six witnesses, Trenton C. Cole, Ernest Burks, Eswin Dean, Bill Dodd, K. B. Fowler, Jr., and Mrs. Lillie D. Kerr, corroborated the evidence of Marvin Harris that the pump was on the pavement that night. Three witnesses, Leland Woods, Trenton C. Cole, and Ernest Burks, had seen the pump in the same place either on Thursday afternoon, Friday afternoon, Saturday morning or Saturday evening before the collision. Six witnesses, Roby McCool, Leland Woods, Trenton C. Cole, Lloyd McCrory, Ernest Burks, and Eswin Dean, gave corroboration as to the mud and dirt on the pavement over the period from Thursday afternoon until after the collision. Eswin Dean gave corroboration that the flares were on the pavement east of the pump. Three witnesses, Trenton C. Cole, Eswin Dean, and W. T. Wasson, gave corroboration that a driver, because of the lights on both sides of the road, could not tell where the road was, or that the traveled portion looked farther to the north, or that the road appeared to be closed in.

Aubrey L. Hays, an engineer and construction superintendent of M & W Construction Company, testified in great detail about the warning signs, the use of the pump and its location, the number of flares and their location, and the absence of dirt and slush because of the fact that Walter S. Ables cleaned the pavement when the work closed down on Thursday. He denied that the pump or any of the flares were on the pavement. His evidence, if true, tended to exonerate M & W Construction Company from all blame. He admitted that he and Ables went to the scene sometime after the collision, when no one else was present, and investigated to see whether the car had hit the pump, and that they had no authority from any one to obstruct the paved portion.

Walter S. Ables corroborated Hays in practically all particulars. He stated that the pump was 3 feet by 3

feet 18 or 20 inches, and admitted that it would have been extremely dangerous for the pump to be sitting one or two feet on the pavement a short distance east of the mound of dirt.

C. W. Rowell testified that he put out the flares and all of them on the south side were from one to two feet off of the pavement. He said the pump was on the shoulder and a flare was between it and the pavement. He admitted that the pump would throw water or slush about 6 feet on the pavement.

T. V. Rone went to the scene after the wreck, and saw the pump sitting "kind of on the pile of dirt". He noticed flares on the north and south sides. There was a big rain that night after the wreck. The next morning he dug down in the dirt and found the pump to be 16 inches from the flare, which was partly on and off the pavement.

Arthur White, a safety engineer, testified as to the sufficiency of the warnings, the grades, the extent of the curve, and the visibility. He was asked on direct examination whether, in his opinion, the placing of the flares as he observed them from the drawings and with the assumptions therefrom would create an optical illusion for a traveller proceeding from the west to the east, and he replied "That is a question that is hard to answer." But he then proceeded to associate it with various elements and came to the conclusion that he could see nothing to cause it. On cross examination he admitted that it is not good practice to leave a pump at night on a highway in the manner shown by the evidence for the complainants, and he does not recommend such. He said that an object should never be left in the road unless it was absolutely necessary; and that if he had happened along and seen the pump on the pavement, he would have told the contractors to slide it off of the pavement.

It was shown that the rainfall on March 17, 18, 19, 20 and 21 was .38, .53, .90, .20 and 1.84 inches.

In resolving this sharply disputed issue of fact, the chancellor was fully warranted in finding that the defendants piled a large mound of dirt near the highway, left the pump on the highway, placed burning flares on the pavement for 135 feet east of the pump, placed burning flares 8 to 10 feet from the pavement on the north side and let sand and dirt accumulate in the south lane of the pavement; that the view to the east was obstructed by the mound; that these acts of the defendants created a situation which on this substantial curve, produced an optical illusion which reasonably caused Leslie to leave his proper lane of traffic and cross over to the center of the road, or other lane, and led him reasonably to believe that he was in his proper lane of traffic when in truth and in fact he was not; and that the creation and maintenance of such a situation was negligence.

## THE PROXIMATE EFFECT OF ABOVE CONDITIONS ON LESLIE.

Eswin Dean testified that the Plymouth made a sudden dip to the left and went around the pump. Mrs. Mary Lucy Fowler testified that Leslie, just as he came to the pump, jerked the car to the left, which pulled it into their lane; that he did not get back on his side, that he did not have time to do so; and that this was what caused the collision. K. B. Fowler, Jr., testified that Leslie just before he got to the pump, which was sitting on the highway, jerked the car to the left in their lane of traffic. Mrs. Lillie D. Kerr testified that she saw the lights of the car coming and Leslie, all of a sudden, swerved his car to avoid hitting a large mound of dirt and a pump in the road.

Of course Leslie is dead, and no direct proof can be given as to why he cut to the left and continued almost in the middle of the road until the collision occurred; but the proof showed that most of the eastbound motorists before and after the collision did the same thing; and

that because of the optical illusion, a motorist would reasonably think that he was in his proper lane when actually he was not, but was partly in the other lane.

██ ██ If the negligence of the defendants in creating and maintaining this situation proximately caused or contributed to Leslie's act in colliding with the Chevrolet automobile, with the consequent tragic results, then the defendants were liable; and direct evidence is not absolutely essential to prove such negligence. It may be shown by circumstantial evidence when sufficient to place it "within the field of legitimate inference." 38 Am. Jur., Negligence, Sec. 333, page 1032; Palmer v. Clarksdale Hospital, 206 Miss. 680, 40 So. 2d 582; Johnston v. Canton Flying Services, Inc., 209 Miss. 226, 46 So. 2d 533; Southern Pine Elec. Power Assn. v. Denson, 214 Miss. 397, 57 So. 2d 859, 59 So. 2d 75; Brown-Miller Co. v. Howell, (Miss.) 79 So. 2d 818.

Tied together in the solution of this lawsuit are the questions of proximate, contributing, and intervening cause. The question here is the same as it was in Miss. City Lines, Inc. v. Bullock, 194 Miss. 630, 13 So. 2d 34, where it was asked, "Did the facts constitute a succession of events so linked together as to make a natural whole, or was there some new and independent cause intervening between the alleged wrong and the injury?"

██ ██ "There may be more than one proximate cause of an injury, 38 Am. Jur., Negligence, Section 63 . . . Moreover, when reasonable minds might differ on the matter, the question of what is the proximate cause of an injury is usually a question for the jury, 65 C. J. S., Negligence, Sec. 264." American Creosote Works v. Harp, 215 Miss. 5, 60 So. 2d 514. See also Magers v. Railroad Co., 174 Miss. 860, 165 So. 416, as follows: "If the defendant's negligence is a substantial factor in causing harm to another, then that action is negligent on the part of the actor. If reasonable men have a difference of opin-

ion as to whether or not the negligence of the actor continued as a substantial factor in bringing about the injury, then the question is for the jury. Restatement, Law of Torts, Sec. 434.

■■ ■ " 'If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.' Section 435, Restatement, Law of Torts.''

One of the landmarks in the jurisprudence of this state on the question of proximate cause is the case of Cumberland Tel. & Tel. Co. v. Woodham, 99 Miss. 318, 54 So. 890, where it is said: ''* * * the negligent act of a person, resulting in injury, is the proximate cause thereof, and creates liability therefor, when the act is of such character that, by the usual course of events, some injury, not necessarily the particular injury, or injury received in the particular manner complained of, would result therefrom, provided the attendant circumstances are such that an ordinarily prudent man ought reasonably to have anticipated that some injury would probably result from the act done. In order that a person may be liable for damages resulting from his negligence, it is not necessary that his negligence should have been the sole cause of the injury. His negligence may be the proximate cause, where it concurs with one or more causes in producing an injury, and, although the author or authors of such cause or causes may also be liable therefor. 29 Cyc. 492-496, inclusive, and authorities there cited. 'If a defendant is negligent, and this negligence combines with that of another or with any other independent intervening cause, he is liable, although his negligence was not the sole negligence, or the sole proximate cause, and although his negligence, without such other independent intervening cause, would not have produced the injury.' Susie B. Harrison v. Kansas City Elec. Light Co., 195 Mo. 606,

93 S. W. 951, 7 L. R. A. (N. S.) 293. * * * but where the negligence of a defendant results in a condition dangerous in itself, such as an ordinarily prudent person ought to have anticiapted might occur, he is liable for any damage resulting therefrom, even though the particular injury complained of would not have resulted, had not the negligence of a third person combined with his.''

In Public Service Corp., et al v. Watts, 168 Miss. 235, 150 So. 192, where the corporation had not kept filled an excavation which it had dug in the street, this omission was held to be a contributing proximate cause of the injury to Watts, on a motorcycle traveling south, when he was struck by the automobile of Smith, going north, as he cut to the left to dodge the excavation, lost control of his machine, and collided with the motorcycle. In rejecting the contention that Smith's action in continuing to the left, after he had fallen in the ditch, until he struck the motorcycle, was an intervening, independent and efficient cause, the Court said: ''If the force which causes the injury is put in operation or motion by what is the negligence of the defendant, and that force or motion is still in progress or operation and has not lost its identity and continuity, as such, when the injury occurs, then the negligence which puts the injurious force in operation is the proximate cause. * * * and at the same time the inquiry involved is typical of those things which should be submitted to the jury.'' The Woodham case, supra, was cited.

In Magers v. Railroad Co., supra, where Magers, at night, drove his automobile into a gondola car that obstructed 4½ feet of the traveled portion of the street, it was held that, even though he was guilty of gross negligence, concurrent with that of the railroad company, this would not defeat a recovery from the negligent actor whose negligence proximately caused or proximately contributed to the injury, and that the cause should have been submitted to the jury.

In Keith v. Y. & M. V. R. Co., 168 Miss. 519, 151 So. 916, as Keith was driving south on a highway, paralleling the railroad right of way, a dense smoke, coming from a fire put out on the right of way by railroad employees, kept him from seeing ahead. He turned to the right and stopped. Thereafter he was struck suddenly by a truck, being driven north through the smoke. The opinion, in reversing the action of the trial court in granting a peremptory instruction for the railroad company, held that the negligence of the truck driver was not the sole proximate cause, but the negligence of the railroad company in creating the smoke on the highway and that of the northbound motorist cooperated to bring about the injury, and that the dense smoke continued to be actively operative. See also Continental Southern Lines v. Klaas, 217 Miss. 795, 65 So. 2d 575.

The case of McKenna v. Scott, 202 Fed. 2d 23, an Oklahoma case, held that the negligent parking by Tree Surgeon Company of its truck about 2 feet on the blacktop surface of the highway set in motion an unbroken chain of circumstances leading to the collision, which was occasioned by a loaded gravel truck veering to the left to pass the parked truck, and the driver's losing control and running into an approaching automobile 40 to 150 feet beyond the obstruction. See also DeBardelaben v. Stallings, 226 Fed. 2d 951, a North Carolina case.

██ █ Appellants contend however that even if they were negligent by reason of the pump and flares being on the side of the pavement, and that the optical illusion resulted from the circumstances, which they deny, yet the last flare on the south side was 201 feet from the point of impact; and that the continued operation by Leslie of the automobile approximately in the middle of the road was an independent intervening cause.

Of course if this collision had occurred a substantial distance east of the setting for the optical illusion ob-

viously the condition on the highway could not be blamed, but it must be remembered that Patrolman Harris testified positively that there was a flare on the south side at a point 72 feet east of the point of impact, and that several other flares were burning in or near Peachtree Street, 186 feet east of the point of impact. Consequently it would be difficult to say that the alleged illusion had ceased to exist. At least reasonable minds might differ theron. Besides, the same witness testified that the position of the Plymouth's impact on the left side could indicate that Leslie was trying to get back to his lane of the road. In addition, at a speed of 45 miles an hour, Leslie would have covered the 201 feet in about 3 seconds. Thus it cannot be said that the chancellor was in error, or manifestly wrong, in rejecting this contention of independent, efficient, intervening cause. "An intervening force, to be efficient, must be a superseding force." Billups Petroleum Co. v. Entrekin, 209 Miss. 302, 46 So. 2d 781. The opinion cited Public Service Corp. v. Watts, supra. It also cited Russell v. Williams, 168 Miss. 181, 150 So. 528, 151 So. 372, which held that, "if the occurrence of the intervening cause might reasonably have been anticipated, such intervening cause will not interrupt the connection between the original cause and the injury."

In Evans Motor Freight Lines, et al v. Fleming, 184 Miss. 808, 185 So. 821, an Evans truck was traveling north on the west side of the road. Miles, in a car, traveling south, was blinded by the lights of the truck. Yet he proceeded for 450 to 1,000 feet in a blinded condition at a speed of 40 miles an hour, until in order to avoid a collision, he swerved his automobile to the right, placing the right wheels on the shoulder and striking and killing Mrs. Fleming, who was walking on the shoulder, and then continued over 100 feet forward before he brought his automobile to a stop. Liability against the motor lines

was affirmed for the reason that the negligence of the driver of the truck was the proximate cause of the swerving of the car to the right to avoid a collision; and against Miles for the reason that he did not slow down and stop when the lights blinded him, and in proceeding in that condition, and in not seeing the deceased on the side of the highway. Moreover, the opinion stated that "it cannot be said that the negligence of the appellants was insulated by the negligence of Miles; nor can it be said that the negligence of the appellant was not a contributing proximate cause of the death of Mrs. Fleming."

In both the case just mentioned and Keith v. Y. & M. V. R. Co.., supra, the drivers were blinded by the lights, or unable to see on account of the smoke. In the present case, the direct evidence was sufficient to show that Leslie jerked his car to the left to avoid the pump, and the circumstantial evidence was sufficient to show that, because of the optical illusion, he reasonably thought that he was in his proper lane of traffic, although he was in fact approximately in the center of the road. The victim of an illusion, or false appearance, falls in the same general category as one without appearance or ability to see at all. Of course it was negligence for Leslie to continue to drive as he did, if he did not know where he was in the road, but such negligence did not insulate the negligence of the appellants. See also the recent cases of Grice v. Central Elec. Power Assn., (Miss.) 92 So. 2d 837; and Meridian Hatcheries v. Troutman, (Miss.) 93 So. 2d 472.

Appellants cite a number of cases including Graves v. Johnson, 179 Miss. 465, 176 So. 256; Central Paving & Construction Co. v. McCaskin, 183 Miss. 814, 184 So. 464; Myers v. Sanders, 189 Miss. 198, 194 So. 300; Dunn Construction Co. v. Nail, 192 Miss. 793, 7 So. 2d 884; C. C. Moore Construction Co. v. Hayes, 119 Fed. 2d 742, and McClendon v. Boyd Construction Co., (Miss.) 80 So. 2d

32, which deal with the duty of contractors toward the traveling public, appellants contend that they gave the requisite notice of such hazards as existed. However, in that line of cases, the road was under construction, or was only partially open to traffic, or had not been accepted, or the contractor was guilty of no negligence, or the injured party was the author of his own misfortune. In the case here, the road was not under construction at all. Neither was it undergoing repairs. The appellants were working on the shoulder. They had no right to block the paved portion. Besides they had not even worked on the project since Thursday afternoon before; and if by chance they could be excused, under certain circumstances, in blocking a part of the paved portion, that excuse would not extenuate the situation which existed from Thursday afternoon until the Saturday night of the tragedy.

Highway No. 12, being a completed highway, the traveler was expected to use only ordinary care. In Graves v. Johnson, supra, it was held that, on such a highway, he has the right to assume that it is in a reasonably safe condition for travel, is free from obstructions, and he need not keep his eyes constantly fixed on the path of the highway, or look ahead for defects which should not exist. Besides, as a general rule, "one who, without right or authority, creates or maintains in, upon, or near a highway a condition which endangers the safety of travelers does so at his own peril and is liable for injuries proximately resulting therefrom. . ." 25 Am. Jur., Highways, Sec. 361, page 654. The cases of Miss. Power Co. v. Sellers, 160 Miss. 512, 133 So. 594; Tombigbee Elec. Power Assn. v. Gandy, 216 Miss. 444, 62 So. 2d 567; Magnolia Petroleum Co. v. Williams, 222 Miss. 538, 76 So. 2d 365; N. O. & N. E. R. Co. v. Burge, 191 Miss. 303, 2 So. 2d 825; Bufkin v. L. & N. R. Co., 161 Miss. 594, 137 So. 517; Mauney v. Gulf Refining Co., 193 Miss. 421,

8 So. 2d 249, 9 So. 2d 780; Sturdivant v. Crosby Lbr. Co., 218 Miss. 91, 65 So. 2d 291; and Permenter v. Milner Chevrolet Co., (Miss.) 91 So. 2d 243, as well as other authorities cited by appellants are not in conflict with the conclusion which has been reached in this case.

Appellants further contend that, since the Plymouth left no skidmarks or evidence that it was wobbling on the pavement, the court was manifestly wrong in finding as a fact that Leslie lost control of his automobile.

██ █ This case, insofar as the appellees were concerned, was tried throughout on the theory that Leslie jerked or swerved his automobile to the left to avoid a collision with the pump, and, because of the optical illusion resulting from the conditions then obtaining, he was caused to continue approximately in the middle of the road until the collision. The law enjoins it upon the driver of an automobile to keep his machine constantly under control. Ulmer v. Pistole, 115 Miss. 485, 76 So. 522; Snyder v. Campbell, 145 Miss. 287, 110 So. 678. Control contemplates driving where and in the manner one reasonably should. ██ █ The center of the pavement had been marked; and except for obstructions Leslie normally would have driven in the south lane in this instance. But the pump suddenly loomed up before him. He jerked or swerved the car to the left, and did not return immediately to the south lane. Thus he was not driving where or in the manner that he should have. His car, for that reason, was actually out of control; and the court was justified in concluding that his failure of control, or loss of control, resulted from the hazardous situation which the appellants created and had thereafter maintained for several days. Consequently this contention is not well taken.

The appellants further contend that the court at all events committed grievous error in refusing to grant them a jury trial especially since questions of negligence and contributory negligence were involved, and it is the

established policy of the jurisprudence of this state that such issues shall be resolved by a jury. Sections 1454-5, Code of 1942.

In Talbot & Higgins Lbr. Co. v. McLeod Lbr. Co., 147 Miss. 186, 113 So. 433, by the bill in chancery, the appellee sought to enjoin the appellant from prosecuting a pending action at law in the circuit court. The sole question was whether the subject matter of the litigation was one of equity or common law jurisdiction. In pointing out that under Section 147 of the Constitution this Court cannot reverse or annul either a judgment or decree in any chancery or circuit court rendered in a civil cause on the ground of want of jurisdiction to render the same from any error or mistake as to whether the cause in which it was rendered was of equity or common law jurisdiction, the opinion dealt with the conflict between that Section and Section 31 of the Constitution, assuring trial by jury, and reconciled them as follows:

"It is true that, where the chancery court assumes jurisdiction of a cause of action cognizable alone in the circuit court, in such a case the absolute right of trial by jury of the issues of fact given in the circuit court causes by Section 31 of the Constitution is taken away, for our court has held that it rests in the discretion of the chancery court whether a jury shall be granted to try issues of fact. But Section 147 is just as much a part of the Constitution and is just as binding on the courts as Section 31 of the Constitution. They are to be construed together. Construed together, they mean that the right of trial by jury of issues of fact in civil causes in the circuit courts shall remain inviolate, except in such cases of exclusively law cognizance as the chancery courts may erroneously assume jurisdiction of, where such error of jurisdiction is the only error in the decree. In such cases the absolute right of trial by jury of the issues of fact is denied; it being discretionary with the chancellor whether such issues of fact shall be tried by a jury. * * * *

The chancery court determined for itself the question of jurisdiction. It was given that right by Section 147 of the Constitution. This court, under the Constitution, is without power to correct the error, if there was error, in the chancery court so assuming jurisdiction.''

██ ██ The chancery court may direct the trial of a proper case by jury. Section 1275, Code of 1942. But such trial is within the discretion of the court. Bland v. Bland, 105 Miss. 478, 62 So. 641; Laub v. Reason, 217 Miss. 475, 64 So. 2d 637.

██ ██ The case of Boyd, et al v. Applewhite, 121 Miss. 879, 84 So. 16, was a suit by minority stockholders to establish the liability of directors and officers for their alleged negligence in the management of the bank. The trial court refused the request of the appellants for a jury trial, and this was assignd as error. In response thereto, the Court said: ''There is no merit in the assignment that appellants asked for and were refused a jury trial. Section 503, Hemingway's Code (Acts 1910, chapter 135), providing that, 'all questions of negligence and contributory negligence shall be for the jury to determine,' has no controlling application in an equity case.''

Consequently the court did not err in refusing to grant a trial by jury in this instance.

The appellants also contend that the scheme whereby the complainants sought to attach the small sum of $23, alleged to be owing to Colonial Life & Accident Insurance Company by Homer A. Moore in order to satisfy their large demands for damages, was a mere device to confer jurisdiction on the court; and that the court should not have assumed jurisdiction by reason of such a trivial amount. They rely strongly on Nicholson v. G. M. & N. R. Co., 177 Miss. 844, 172 So. 306.

██ ██ The Court has found no reversible error in this record. Consequently, whether the court was in error in taking jurisdiction of these cases is wholly immaterial since Section 147 of the Constitution forbids

this Court to reverse or annul the decree "on the ground of want of jurisdiction to render said judgment or decree, from any error or mistake as to whether the cause in which it was rendered was of equity or common-law jurisdiction". Talbot & Higgins Lbr. Co. v. McLeod Lbr. Co., supra, cited 16 early cases, beginning with Cazeneuve v. Curell, 70 Miss. 521, 13 So. 32, and ending with Engleburg v. Tonkel, 140 Miss. 513, 106 So. 447, to show this Court's interpretation of, and adherence to the plain language of Section 147, supra. Some of the later cases are Taylor v. Hines, 221 Miss. 759, 74 So. 2d 834, and Myers v. Giroir, (Miss.) 84 So. 2d 525. Conceding but not deciding that there is merit in this contention, the case could not be reversed on that ground.

In passing, not by way of decision but as negativing the contention that the action of the learned chancellor, in taking jurisdiction of these cases, was arbitrary and capricious, these facts should be pointed out: Section 2729, Code of 1942, does not specify the minimum amount of the indebtedness necessary to be owing by the resident to the non-resident defendant. The collision, with its consequent injuries and deaths, occurred in Attala County. It is not contented that suits could not have been brought in the circuit court. The appellants were not deprived of their right to be sued in a fixed venue, as was the case of Nicholson v. G. M. & N. R. Co., supra. There was no collusion between the complainants and Homer A. Moore, the resident defendant, alleged to have been indebted to the insurance company. There was no fraud whatsoever.

Thorough consideration and study have been given to all alleged errors which were assigned and argued. Since no reversible error appears in the record, it follows that the decrees of the lower court must be and they are, in each instance, affirmed.

Affirmed.

All Justices concur, except *Kyle, J.,* who took no part.